T.C. Memo. 1997-283


UNITED STATES TAX COURT


REAVES LIVESTOCK, INC., ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6594-94, 6630-94,          Filed June 23, 1997.
          11155-95.


    Ocie F. Murray, Jr., for petitioners Reaves Livestock, Inc.,

and George K. Reaves.

    Matthew Bates, for petitioner Linda L. Reaves.

    Frank C. McClanahan, for respondent.


_____

    [1] The cases of George K. and Linda L. Reaves, docket Nos.
6630-94 and 11155-95, were consolidated for purposes of trial,
briefing, and opinion.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows:

### Reaves Livestock, Inc.

| Year | Deficiency | Additions to Tax Sec. 6653(b)(1) | Sec. 6653(b)(1)(A) | Sec. 6661 |
|------|-----------|-----------|-----------|-----------|
| 1984 | $39,374 | $28,835 | | $14,418 |
| 1985 | 79,218 | 42,459 | | 21,229 |
| 1986 | 95,420 | | $91,216 | 30,405 |
| 1987 | 85,092 | | 74,947 | 24,982 |

Respondent also determined that Reaves Livestock, Inc. (Reaves Livestock) is liable for additions to tax for fraud of 50 percent of the interest due on $57,670 for 1984 and $84,918 for 1985 under section 6653(b)(2), and 50 percent of the interest due on $121,621 for 1986 and $99,929 for 1987 under section 6653(b)(1)(B).

### George K. Reaves and Linda L. Reaves

| Year | Deficiency | Additions to Tax Sec. 6653(b)(1) | Sec. 6653(b)(1)(A) | Sec. 6661 |
|------|-----------|-----------|-----------|-----------|
| 1984 | $40,883 | $20,552 | | $10,221 |
| 1985 | 66,787 | 34,452 | | 16,697 |
| 1986 | 130,741 | | $98,056 | 32,685 |
| 1987 | 112,224 | | 84,168 | 28,056 |

Respondent also determined that George K. Reaves (Mr. Reaves) and Linda L. Reaves (Mrs. Reaves) are liable for additions to tax for fraud of 50 percent of the interest due on $40,883 for 1984 and $66,787 for 1985 under section 6653(b)(2), and 50 percent of the interest due on $130,741 for 1986 and $112,224 for 1987 under section 6653(b)(1)(B).

George K. Reaves and Linda L. Reaves

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662 |
| 1988 | $22,746 | $1,137 | $5,687 | |
| 1989 | 1,148 | | | $230 |

Following concessions, we must decide the following issues:[2]

1.    Whether Mr. and Mrs. Reaves received constructive dividends of $93,460 in 1984, $144,287 in 1985, $270,200 in 1986, and $273,889 in 1987, as respondent contends; $13,814 in 1984, $19,551 in 1985, $89,150 in 1986, and $68,556 in 1987, as petitioners contend; or some other amount.  We hold that they received constructive dividends of $93,410 in 1984, $130,551 in 1985, $270,200 in 1986, and $222,982 in 1987.

2.    Whether Mr. and Mrs. Reaves are liable for the additions to tax for fraud under section 6653(b)(1) and (2) for 1984 and 1985 and section 6653(b)(1)(A) and (B) for 1986 and 1987.  We hold that they are to the extent stated below.

3.    Whether respondent timely issued a notice of deficiency to Mr. and Mrs. Reaves for 1984 and Reaves Livestock for all of the years in issue.  We hold that respondent did.

4.    Whether petitioners are liable for the addition to tax for substantial understatement of tax under section 6661(a) for

_____

[2] Spouses who sign a joint return are jointly liable for the addition to tax for negligence.  See Pesch v. Commissioner, 78 T.C. 100, 128-129 (1982).  Mrs. Reaves is liable for the addition to tax for negligence under sec. 6653(a)(1) for 1988 because Mr. Reaves concedes liability and, as discussed below at par. F of the opinion, Mrs. Reaves does not qualify as an innocent spouse under sec. 6013(e).

1984, 1985, 1986, and 1987.  We hold they are for the years for which the understatement is substantial.

5.    Whether Reaves Livestock is liable for the additions to tax for fraud under section 6653(b)(1) and (2) for 1984 and 1985 and section 6653(b)(1)(A) and (B) for 1986 and 1987.  We hold that it is to the extent stated below.

6.    Whether Linda L. Reaves qualifies as an innocent spouse under section 6013(e).  We hold that she does not.

Unless otherwise indicated, section references are to the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

A.    <u>Petitioners</u>

1.    <u>Mr. and Mrs. Reaves</u>

Mr. and Mrs. Reaves are married and lived in Rowland, North Carolina, when they filed the petition in this case.

Mr. Reaves has an eighth grade education.  In 1971, he formed Reaves Livestock, a North Carolina corporation, the principal place of business of which is in Rowland, North Carolina.  Mr. Reaves has been the president and sole shareholder of Reaves Livestock since 1971.  Mr. Reaves has no experience or formal training in bookkeeping or tax matters.

Mrs. Reaves graduated from high school and attended business school for 3 months.  She had no formal training in bookkeeping

or accounting. She kept her and Mr. Reaves' personal accounts and records.

Mr. and Mrs. Reaves had three children: Sandra, born in 1962; Tina, born in 1966; and Mike, born in 1967 or 1968. Mike Reaves raised and sold livestock.

Mr. and Mrs. Reaves had two personal accounts at Southern National Bank of North Carolina (Southern National) in Rowland, North Carolina. One was in the name of George K. and Linda L. Reaves. The other was in the name of Reaves Farm. In 1986, Mrs. Reaves inadvertently deposited a $10,197 payment to Reaves Livestock for the sale of cattle in one of the Reaves' personal accounts.

Mr. and Mrs. Reaves had a conservative lifestyle during the years in issue. They generally took no vacations other than at their beach house. From 1986 to 1993, Mr. Reaves drove a 1986 Ford pickup truck that belonged to Reaves Livestock. Mrs. Reaves owned a 1983 Oldsmobile before 1986 until 1988.

2. Reaves Livestock, Inc.

a. General Business Activities

Reaves Livestock bought livestock from farmers and sold it to packing companies.

Mr. Reaves usually arrived at work at the Reaves Livestock barn at 7 or 7:30 a.m. He often left the barn around 8 a.m. to attend livestock sales. He returned around 8 p.m. and usually

went to the barn. Mr. Reaves also worked in the office, but he did no bookkeeping.

During the years in issue, Reaves Livestock had about nine truck drivers and five or six barn men. The barn men loaded and unloaded livestock, weighed them, and put them in pens.

Samuel Ray Cummings (Cummings) worked for Reaves Livestock during the 1980's. He stole money from Reaves Livestock while he worked there.

Farmers sometimes asked Reaves Livestock to pay cash for their livestock.

From 1984 to 1987, Reaves Livestock reported gross receipts and taxable income as follows:

| Year | Gross receipts | Taxable income |
|------|----------------|----------------|
| 1984 | $17,565,725 | $77,149 |
| 1985 | 19,269,418 | 99,687 |
| 1986 | 23,317,287 | 49,739 |
| 1987 | 22,676,647 | 35,838 |
| Total | $82,829,077 | $262,413 |

b. Reaves Livestock's Bookkeepers--Bonnie Wright and Jeff Lawson

Mr. Reaves met Bonnie Wright (Wright) in the late 1960's when they worked at Powell Livestock Co. Wright kept records and wrote checks for Powell Livestock Co. Wright worked for Reaves Livestock from the early 1970's to 1987. Wright was the corporate secretary and treasurer for Reaves Livestock.

Wright had a son, Jeff Lawson (Lawson). At her request, Mr. Reaves hired Lawson as a bookkeeper for Reaves Livestock around

June 1980. Lawson has an associate's degree in accounting and business administration and has completed 3 years towards his bachelor's degree in accounting. Lawson earned from $195 to $225 per week in 1984, $225 per week in 1985, from $245 to $300 per week in 1986, and from $300 to $500 per week in 1987. He received more than $6,000 in bonuses from 1984 to 1987. Lawson became corporate secretary and treasurer for Reaves Livestock after Wright stopped working there in 1987.

Wright and Lawson were Reaves Livestock's only bookkeepers during the years in issue. Wright usually arrived at work between 9:30 a.m. and 11 a.m. and stayed until late in the evening. Lawson usually arrived about 7:30 a.m. and left between 4 p.m. and 5 p.m.

Wright and Lawson maintained Reaves Livestock's books and records and knew about all of its transactions. They wrote the checks, balanced the checking account, reconciled the bank statements, and made deposits in Reaves Livestock's account. They wrote 6,000 to 7,000 checks per year. They kept a double entry set of books; i.e., they posted an entry once as a credit and once as a debit. They kept journals and ledgers for Reaves Livestock.

Reaves Livestock had a checking account at Southern National (Reaves Livestock account) during the years in issue. Mr. and Mrs. Reaves, Wright, and Lawson were authorized to sign checks on the Reaves Livestock account. If Mr. Reaves arrived in the

morning and Wright was not there, Mr. Reaves signed 15 to 30 blank checks to be used to buy livestock. Wright signed additional checks on the Reaves Livestock account as needed. Mr. Reaves did not usually prepare checks or review completed checks after he signed them in blank.

Lawson was not authorized to sign checks for Reaves Livestock until he became an officer of the company early in 1987. Before Lawson had check signing authority, he prepared checks previously signed by Mr. Reaves if Mr. Reaves was away. Lawson signed most of the checks after he had check signing authority.

Lawson used drugs in the 1980's and was convicted of possessing marijuana in 1982. Lawson went to a bowling tournament in Las Vegas in 1985 and 1986 and to New England and Canada for 5 days in 1987. Lawson bought a 1985 Buick Regal in 1986 or 1987 for his sister. He bought a new BMW automobile in 1987, which he kept for less than 6 months. Lawson sometimes played poker with Mr. Reaves and several other people.

c.  Mr. Reaves' Involvement With Reaves Livestock's
Books and Records

Every Monday the bookkeepers told Mr. Reaves the amount of Reaves Livestock's cash on hand, the bank balance, how much money was owed to them, how much money they had spent to buy livestock, the amount of money that they had spent to pay bills, and the cash and livestock that they had on hand the previous Monday.

Mr. Reaves could tell how well Reaves Livestock was doing financially from the amount and the profit margin of inventory that he bought and sold. He could detect a mistake as small as a few thousand dollars. Mr. Reaves did not know what books and records Reaves Livestock kept during the years in issue, nor did he review its books and records.

d.    Mrs. Reaves' Role at Reaves Livestock

Mrs. Reaves was vice president of Reaves Livestock during the years in issue. From 1984 to 1988, she occasionally helped in the office by writing invoices, weight tickets, bills, and checks including payroll. She also checked daily stockyard bills. She did no bookkeeping. Mr. and Mrs. Reaves reported that Mrs. Reaves received a salary from Reaves Livestock of $4,067 in 1984, $4,071 in 1985, $3,000 in 1986, and $3,000 in 1987.

B.    The First Citizens Bank Accounts

1.    Establishment and Control of The Accounts

Reaves Livestock is about one mile from South of the Border, South Carolina. Mr. Reaves opened accounts at First Citizens Bank & Trust Co. (First Citizens) at South of the Border and maintained them during the years in issue in the names of S&J Hog Farm (S&J) and George K. Reaves (First Citizens accounts). Mr. Reaves caused some unreported Reaves Livestock receipts to be deposited in the First Citizens accounts. He also caused some Reaves Livestock checks (which Reaves Livestock deducted as

business expenses) to be deposited in the First Citizens accounts.

Only Mr. and Mrs. Reaves were authorized to sign checks and make withdrawals from the First Citizens accounts. The Social Security number on the signature card for the S&J account was not that of Mr. or Mrs. Reaves.

Wright and Lawson knew about the First Citizens accounts. They balanced the S&J account but not the George K. Reaves account. During the years in issue, Mr. and Mrs. Reaves, Wright, and Lawson (in 1988) signed Reaves Livestock account checks which were deposited in the First Citizens accounts. Wright and Lawson recorded those checks as purchases on Reaves Livestock's books.

Wright and Lawson stored the checkbooks, canceled checks, and bank statements for the Reaves Livestock account and the First Citizens accounts in a filing cabinet in the storage room at Reaves Livestock's office. The filing cabinet doors were open during the day.

The deposits in the First Citizens accounts totaled as follows:

| Year | Reaves account | S&J account |
|------|---------|---------|
| 1984 | $29,010 | $9,937 |
| 1985 | 27,744 | 110,041 |
| 1986 | 68,052 | 149,162 |
| 1987 | 105,541 | 238,185 |

2.   The S&J Account

     a.   Purpose of the S&J Account

Wallace "Slick" Prevatte (Prevatte) formerly worked for Mr. Reaves or Reaves Livestock.  Mr. Reaves' nickname is "Jackie". "S&J" stood for Slick and Jackie.  Mr. Reaves created S&J Hog Farm because some businesses wanted to deal with a farm, not Reaves Livestock.  S&J bought and sold hogs and cattle.  Prevatte received a commission for hogs that he sold.  He had no authority over the S&J account.

     b.   Checks Written on S&J Account

Mr. and Mrs. Reaves signed checks written on the S&J account as follows:

|        |          | Hog farm |          | No. of checks signed by | |
| Year   | Personal | related  | Disputed | Mr. Reaves | Mrs. Reaves |
| 1984   | $0       | $845     | $0       | 0          | 2           |
| 1985   | 5,006    | 61,225   | 4,750    | 2          | 2           |
| 1986   | 3,325    | 149,371  | 55,000   | 16         | 3           |
| 1987   | 10,600   | 230,364  | 23,800   | 44         | 5           |
| 1988   | 18,262   | 324,061  | --       | 72         | 12          |
| Total  | $37,193  | $765,866 | $83,550  | 134        | 24          |

Lawson wrote some of the S&J checks which Mr. or Mrs. Reaves signed.  We discuss the disputed checks below at pars. B-2-d, B-2-e, and G.

     c.   Reaves Livestock Payments To S&J Hog Farms

Reaves Livestock bought cattle from S&J with the following seven checks, which were payable to S&J:

| Date | Amount | Signed by | Endorsed by | Notation |
|------|--------|-----------|-------------|----------|
| Jan. 31, 1986 | $242 | Mr. Reaves | S&J | 1 Hfr.-440# |
| Feb. 4, 1986 | 179 | Wright | S&J | 1 Bull-715# |
| Feb. 5, 1986 | 1,300 | (not signed) | S&J | 11 calves |
| Mar. 17, 1986 | 1,147 | Mr. Reaves | S&J | 2 Bulls-2,730# |
| Mar. 24, 1986 | 3,944 | Wright | S&J<br>Mr. Reaves | 15 clfs-6635# |
| Sept. 22, 1986 | 950 | Wright | S&J<br>Mr. Reaves | 2 Cattle-BH |
| Oct. 6, 1986 | 1,287 | Wright | S&J<br>Mr. Reaves | 3 Cattle-3230# |
| Total | $9,049 | | | |

### d. $4,750 Check Payable to Mrs. Reaves

On December 16, 1985, Neil Lee (Lee), a farmer who sold feed, offered to sell a load of corn to Mr. Reaves. Mrs. Reaves wrote a $4,750 check on the S&J account payable to herself with the notation "feed". Mrs. Reaves endorsed and cashed the check. Mr. Reaves used the proceeds to pay Lee for the corn.

### e. $23,800 Check Payable to Crook Motor Co.

In 1987, Mr. Reaves wrote a $23,800 check on the S&J account payable to Crook Motor Co., Inc. Mr. Reaves lent the money to Robert Martin, a former employee of Reaves Livestock, and his partner, Hubert Kissam, to buy a dump truck for Martin's and Kissam's business, Lumberton Paving and Grading Co. (Lumberton Paving). Lumberton Paving mortgaged the dump truck. Lumberton Paving went bankrupt in 1989. The dump truck was sold at an auction.

3. The George K. Reaves Account

Mr. Reaves signed most of the checks in 1984, 1985, and 1988[3] drawn on the George K. Reaves account at First Citizens, which totaled as follows:

|        |          | Business  |          |
|--------|----------|-----------|----------|
| Year   | Personal | Related   | Disputed |
| 1984   | $11,564  | $0        |          |
| 1985   | 11,545   | 55,075    |          |
| 1986   | 17,628   | 50        | $11,730  |
| 1987   | 71,849   | 31,358    | 19,151   |
| 1988   | 47,384   | 45,569    |          |
| Total  | $159,970 | $132,052  | $30,881  |

We discuss the disputed checks next.

a. $11,730 Check Payable to Allstate Truck & Equip., Inc.

On December 26, 1986, Mr. Reaves wrote an $11,730 check on the George K. Reaves account payable to Allstate Truck & Equip., Inc., to buy a lowboy trailer. Lumberton Paving used the trailer. Lumberton Paving could not repay the $11,730.

b. $19,151 Check Payable to First Citizens

On March 23, 1987, Reaves Livestock bought a small old house in Dillon, South Carolina (Dillon house) for Doug Grant (Grant), a Reaves Livestock employee. Grant lived about 60 miles from Rowland and wanted to live closer to work.

Mr. Reaves wrote a $19,151 check on the George K. Reaves account payable to First Citizens to buy the Dillon house. Title to the Dillon house was in Mrs. Reaves' name. Grant did not want

_____

[3] The record does not show who signed the George K. Reaves account checks in 1986 and 1987.

title to the Dillon house to be in his name because he had some judgments against him.

Grant lived in the Dillon house, repaired it, and paid taxes and insurance on it. In March 1993, Reaves Livestock sold the Dillon house to Grant for $20,000. Mrs. Reaves transferred title to him. Grant paid $20,000 to Reaves Livestock.

C.   The 282 Checks

A total of 282 checks were drawn on the Reaves Livestock account and payable to fictitious persons from 1984 to 1987 (the 282 checks). Reaves Livestock deducted the 282 checks as business expenses. The checks totaled the following amounts each year:

| Year | Amount |
|------|--------|
| 1984 | $79,596 |
| 1985 | 111,000 |
| 1986 | 153,051 |
| 1987 | 154,426 |
| Total | $498,073 |

All but one of the 282 checks included notations such as "5 hogs - 2975#", "corn", or "3 cattle - 2200#". Mr. Reaves and Wright signed most of the 282 checks. Lawson signed seven of the checks totaling about $19,701 from November 17 to December 29, 1987. Lawson cashed 273 of the 282 checks. Mrs. Reaves endorsed two of the checks, Mr. Reaves endorsed one, and Prevatte endorsed one. Lawson cashed four of the 282 checks, totaling $35,000, on August 28 and 29, 1986.

Lawson made up most of the names of the payees for the checks that he wrote. Wright or Lawson wrote most of the 282 checks that Lawson cashed. Lawson usually endorsed the fictitious names with altered handwriting, countersigned his name with his normal signature, and then went to Southern National to cash the checks.

The bank did not always require Lawson to endorse the checks, but he did so if asked. Lawson told the bank tellers that he was cashing the checks for people who had sold livestock to Reaves Livestock and were waiting for him at the Reaves Livestock barn, but were too busy or lacked the proper identification to cash the checks.

At a time not specified in the record, several of the tellers became concerned about the fact that Lawson was cashing Reaves Livestock account checks payable to third parties. They told Don Ballard (Ballard), bank manager for Southern National, what Lawson was doing. Ballard telephoned Mr. Reaves and told him Lawson had been cashing checks which were not payable to Lawson. Mr. Reaves gave permission to Ballard for Southern National to cash those checks. Ballard then authorized the tellers to cash the checks.

Lawson initially tried to conceal the check cashing scheme from respondent. He told Thomas W. Bozeman (Bozeman), respondent's agent, that he had not endorsed the checks, that he could not recall that Mr. Reaves had asked him to endorse checks

written to Jim Butler or anyone else, and that he did not know that Reaves Livestock had lent $55,000 (discussed below at par. G) to Mr. and Mrs. Reaves. Those statements were false.

Mr. Reaves took no action against the bank or Lawson for cashing the 282 nominee checks.

D. The John Chavis Checks

Mr. Reaves told Lawson to give money to Mrs. Reaves each month by writing a Reaves Livestock check for $250. For each of the 36 months from December 1984 to November 1987, Lawson or Wright wrote a $250 check with the notation "hay", except for one that said "salary". Thirty-four of the checks were payable to John Chavis, one to Ray Hunt, and one to Ray Ofendine (John Chavis checks). The John Chavis checks were payable to fictitious payees. Mrs. Reaves signed 29 of the checks, Mr. Reaves signed 5, Wright signed 1, and 1 was unsigned. Mrs. Reaves endorsed 35 of the checks by signing John Chavis or Linda Reaves. One was not endorsed. She countersigned 7 of the 36 checks and cashed all of them.

These payments totaled $2,250 in 1984, and $3,000 in 1985, 1986, 1987, and 1988. These payments were deducted by Reaves Livestock as a business expense and were not reported as income by Mr. and Mrs. Reaves.

E. The Lumberton Auction Checks

Lumberton Auction Co., Inc. (Lumberton Auction) issued the following checks, all of which were cashed:

| Date | Payee | Amount | Endorser |
|------|-------|--------|----------|
| Mar. 9, 1984 | Reaves Livestock | $50 | Reaves Livestock |
| Apr. 24, 1985 | S&J Livestock | 1,130 | S&J Livestock Jeff Lawson |
| June 5, 1985 | S&J Farms #2 | 298 | S&J Reaves Livestock By Jeff Lawson |
| June 5, 1985 | S&J Farms | 1,269 | S&J Reaves Livestock By Jeff Lawson |
| July 10, 1985 | Mike Reaves | 935 | Mike Reaves By Jeff Lawson |
| Aug. 14, 1985 | Slick Prevatte | 1,526 | Slick Prevatte By Jeff Lawson |
| Aug. 28, 1985 | Slick Prevatte | 2,986 | Slick Prevatte |
| Sept. 4, 1985 | Slick Prevatte | 284 | Slick Prevatte |
| Sept. 4, 1985 | Slick Prevatte | 145 | Slick Prevatte |
| Oct. 30, 1985 | Slick Prevatte | 121 | Slick Prevatte By Jeff Lawson |
| Nov. 13, 1985 | Slick Prevatte | 293 | Slick Prevatte |
| Apr. 2, 1986 | Jackie Reaves | 95 | Mr. Reaves |
| Apr. 2, 1986 | Reaves Livestock | 63 | Reaves L/S |

Prevatte and Mike Reaves received the cash from the checks which were payable to them.

F.   Other Checks

1.   Circle S Checks

Circle S Livestock, Inc. (Circle S) issued checks payable to Marlboro Farms on May 1, 1987, for $3,164 and $2,555 which Mr. Reaves cashed.  Mr. Reaves used the proceeds to buy livestock. Marlboro Farms was a pasture on which Reaves Livestock placed livestock.

2.   $9,300 Check to Mike Reaves

On September 29, 1986, two individuals issued a check to Mike Reaves for $9,300 to buy cows.  Mike Reaves endorsed and cashed the check.

G.    The Beach House

Mr. Reaves asked Kenneth Davis (Davis), a certified public accountant and return preparer, if it would be proper for Reaves Livestock to lend money to Mr. and Mrs. Reaves to buy a beach house.  Davis said that it would.  Mr. Reaves told Mrs. Reaves that they were going to borrow $55,000 from Reaves Livestock to buy a beach house for themselves.

On November 24, 1986, Reaves Livestock lent $55,000 to Mr. and Mrs. Reaves.  Mrs. Reaves used that $55,000 and other money to buy a beach house on November 25, 1986.

On December 11, 1986, Mrs. Reaves repaid Reaves Livestock with a $55,000 check drawn on the S&J account.

In early 1987, Mrs. Reaves paid Allendale Furniture Co. $6,000 from the George K. Reaves First Citizens account for beach furniture.

H.    Petitioners' Tax Returns

1.    Reaves Livestock's Tax Returns

Davis prepared Reaves Livestock's income tax returns for the years in issue.

At the end of the year, Wright or Lawson gave Reaves Livestock's ledgers and journals to Davis for him to prepare its corporate income tax return.  Neither Mr. nor Mrs. Reaves gave Davis any of Reaves Livestock's records.  Mr. Reaves gave inventory information to Wright or Lawson to give to Davis to include in the corporate tax return.  Davis could have reviewed

any of the records at Reaves Livestock, including First Citizens records.  He sometimes visited the business to meet with Wright or Lawson when Mr. Reaves was not present.  Mr. Reaves did not know what information Wright or Lawson gave to Davis.  Davis used Reaves Livestock's journals and ledgers to prepare its tax returns, but he did not verify their accuracy.  He generally asked Wright or Lawson any questions he had about journal entries.  He did not review Reaves Livestock's bank account statements or canceled checks to prepare its corporate tax returns.  He sometimes did a quick net worth evaluation in December.  He did not perform any monthly services for Reaves Livestock or for Mr. and Mrs. Reaves.

Each December, Davis and Mr. Reaves discussed Reaves Livestock's performance and its likely tax liabilities.  After he prepared the tax returns for Reaves Livestock and Mr. and Mrs. Reaves, Davis brought the returns to Mr. Reaves.  Davis briefly reviewed them with Mr. Reaves before Davis filed them.

2.   Mr. and Mrs. Reaves' Income Tax Returns

Mrs. Reaves decided which of her and Mr. Reaves' personal records to give to Davis.  She searched their canceled checks for potential income tax deductions.  She gave Davis bank statements, Forms W-2 and 1099, and canceled checks which she believed substantiated their deductions.

The First Citizens accounts paid interest (in an amount not stated in the record) which neither Mr. and Mrs. Reaves nor

Reaves Livestock reported on their income tax returns for the years in issue. Reaves Livestock overstated its deductions by deducting payments to the First Citizens accounts as business expenses. Mr. Reaves caused amounts payable to Reaves Livestock to be deposited in the First Citizens accounts. Neither Reaves Livestock nor Mr. and Mrs. Reaves reported those amounts as income on the returns they originally filed for 1984, 1985, 1986, and 1987.

Davis prepared and filed Mr. and Mrs. Reaves' returns for 1984 on April 15, 1985, for 1985 on April 15, 1986, for 1986 in April 1987, for 1987 on April 15, 1988, and for 1988 on April 17, 1989. Davis first heard about the First Citizens accounts when Bozeman told him about them in December 1988.

I.  Later Events

1.  Criminal Investigation of Mr. and Mrs. Reaves

Respondent began a criminal investigation of Mr. and Mrs. Reaves in December 1988. Mr. and Mrs. Reaves gave Bozeman Reaves Livestock's Southern National account records, but not the First Citizens records. Bozeman obtained the First Citizens account records from First Citizens in response to a summons. Mr. and Mrs. Reaves gave Bozeman their personal records. Some of those records did not cover all of the years in issue. Mr. Reaves voluntarily gave a handwriting exemplar.

2.    Reaves Livestock's Amended Tax Returns

In June 1989, after Bozeman told Davis about the First Citizens accounts, Davis prepared amended corporate returns which included the First Citizens accounts in the Reaves Livestock records.

3.    Respondent's Taped Telephone Conversation Between Lawson and Mr. Reaves

On September 25, 1989, at respondent's request, Lawson placed a telephone call to Mr. Reaves which respondent recorded without Mr. Reaves' knowledge. When Lawson agreed to make the call, he feared that respondent would treat the cash from the 282 checks as his income. When Lawson called Mr. Reaves' house, Mike Reaves answered. Lawson concealed from him that respondent was recording the call.

Mr. Reaves' recorded comments confirm that Lawson had been giving him an unspecified amount of cash. During the call, Mr. Reaves said that if respondent's agents asked Lawson what Mr. Reaves did with the money, Lawson should say that he did not know because that was true. Mr. Reaves said that Lawson should say that Mr. Reaves needed cash for feed, cattle, or other business

expenses.  Mr. Reaves told Lawson that Davis would probably say to tell the truth.

Lawson stopped working for Reaves Livestock in January 1990.

4.  Reaves Livestock's Second Amended Tax Return

Davis filed a second amended corporate return for 1986 in August 1990, because he had misclassified a $55,000 check.  In it, Davis decreased the amount reported for purchases by $55,000.

5.  Criminal Conviction of Mr. and Mrs. Reaves

On April 1, 1991, petitioners were indicted for willfully signing and filing false returns under section 7206(1) for 1984, 1985, 1986, and 1987.  On June 3, 1991, Mrs. Reaves pleaded guilty to violating section 7206(1) for 1986 and Mr. Reaves pleaded guilty to violating section 7206(1) for 1987.  The other counts were dismissed.

6.  Mr. and Mrs. Reaves' 1990 Tax Returns

Davis prepared and filed Mr. and Mrs. Reaves' 1990 joint individual Federal income tax returns on August 15, 1991.  Davis included the previously unreported income as a constructive dividend on Mr. and Mrs. Reaves' 1990 return.  As a result, they reported that they had received a $171,928 dividend from Reaves Livestock.  They intended that amount to represent unreported income of $13,054 for 1984, $15,645 for 1985, $75,933 for 1986, $49,802 for 1987, and $17,494 for 1988 from the First Citizens

accounts.  Davis included what he believed was income from the First Citizens accounts.

OPINION

A.  Overview

The primary issues for decision are whether Mr. and Mrs. Reaves received constructive dividends from Reaves Livestock and are liable for additions to tax for fraud, negligence, or substantial understatement of tax for the years in issue, and whether Reaves Livestock is liable for additions to tax for fraud and substantial understatement of tax for the years in issue.

Petitioners concede that petitioners received cash dividends from the checks which were payable to fictitious payees (e.g., John Chavis) and endorsed and cashed by Mrs. Reaves, but contend that petitioners' underpayments of tax related to those checks were not due to fraud.  Petitioners concede that checks from the First Citizens accounts used to buy personal items are constructive dividends to them, but contend that petitioners' underpayments of tax related to those checks were not due to fraud.  Petitioners contend that the proceeds of the 282 checks payable to fictitious persons and cashed by Lawson are not constructive dividends to Mr. and Mrs. Reaves and that petitioners' underpayments of tax related to those checks were not due to fraud.

B.    Constructive Dividends

The parties dispute whether the following items are constructive dividends to Mr. and Mrs. Reaves:  (1) The 282 checks written on the Reaves Livestock account and payable to fictitious persons; (2) two Circle S checks payable to Marlboro Farms; (3) Lumberton Auction checks payable to Reaves Livestock, S&J, Slick Prevatte, and Mike Reaves; (4) seven checks written on the Reaves Livestock account payable to S&J and cashed by Lawson; (5) a $4,750 check written on the S&J account dated December 16, 1985, payable to Mrs. Reaves; (6) an $11,730 check written on the George K. Reaves account dated December 26, 1986, payable to Allstate Truck & Equip., Inc.; (7) a $23,800 check written on the George K. Reaves account dated December 28, 1987, payable to Crook Motor Co., Inc.; (8) a $19,151 check written on the S&J account dated March 23, 1987, payable to First Citizens Bank for a cashier's check; and (9) seven Reaves Livestock checks payable to S&J.[4]

---

[4] Mr. and Mrs. Reaves concede that they received constructive dividends from checks written on the First Citizens accounts and the John Chavis checks in the following amounts: $13,814 in 1984, $19,551 in 1985, $89,150 in 1986, $68,556 in 1987, and $58,646 in 1988.

A sole shareholder receives a constructive dividend to the extent of the corporation's earnings and profits[5] if the corporation pays a personal expense of its shareholder, or lets the shareholder use corporate property for a personal purpose. Secs. 301, 316; Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 744 (1973). Whether a shareholder receives a constructive dividend is a question of fact. Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549; Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214-1215 (5th Cir. 1978).

1. The 282 Checks Payable to Fictitious Persons

Petitioners contend that the proceeds from the 282 checks are not constructive dividends to Mr. and Mrs. Reaves because Lawson embezzled them. Mr. Reaves testified that Lawson embezzled the cash. Lawson testified that he gave the cash from the 282 checks to Mr. Reaves. Mr. Reaves' testimony on this point was not credible for reasons stated next.

We give more weight to the objective facts than to the testimony about the 282 checks. The objective facts show that

---

[5] Petitioners do not contend that Reaves Livestock lacked enough earnings and profits to pay the constructive dividends at issue in this case.

Lawson did not embezzle the proceeds of the 282 checks from Reaves Livestock. First, Mr. and Mrs. Reaves did not act like victims of a nearly $500,000 embezzlement. They did not file charges against Lawson or otherwise try to collect the funds from Lawson or Southern National. Mr. Reaves contends that he wanted to pursue Lawson and the bank, but his attorneys advised against it, and the statute of limitations had run. He gave no convincing reason why he waited after the period of limitations had run to act. Mr. Reaves testified that an unnamed law enforcement official administered lie detector tests to Mr. Reaves, Mrs. Reaves, and Lawson. His explanation of his purported efforts to recover the money lacked detail and was not believable.

Second, we do not believe that nearly $500,000 left Reaves Livestock without Mr. Reaves' knowledge. For example, Mr. Reaves surely would have noticed that $35,000 was missing when Lawson cashed four checks on August 28 and 29, 1986, based on Mr. Reaves' testimony that he could detect errors of a few thousand dollars in the weekly cash flow report.

Third, there is no evidence that Wright or Lawson used nearly $500,000 in funds embezzled from Reaves Livestock. Petitioners point out some expenditures that Lawson and Wright made during the years in issue, but not enough to show that they

lived beyond their means.  There is certainly no showing that Lawson or Wright received nearly $500,000 from the 282 checks.

Mr. Reaves' claim that Lawson never had authority to endorse checks for Reaves Livestock is inconsistent with the fact that Lawson endorsed some of the Lumberton Auction checks.  Mr. Reaves authorized Ballard to permit Lawson to endorse third party checks.  The recorded telephone conversation also shows that Mr. Reaves authorized Lawson to endorse checks.

Petitioners contend that the recorded telephone conversation shows that Mr. Reaves did not receive the cash from the 282 checks and that Lawson embezzled it.  We disagree.  During that conversation, Mr. Reaves acknowledged that he had received cash from Lawson when he advised Lawson to say that Mr. Reaves needed the cash for business purposes and that Lawson did not know what Mr. Reaves did with the money.

Petitioners contend that Lawson could not have given Mr. Reaves the cash from the 282 checks because Mr. Reaves and Lawson were rarely in the office at the same time.  We disagree.  Mr. Reaves and Lawson were together sometimes, such as when Lawson and Wright gave Mr. Reaves the weekly financial report of Reaves Livestock, and when Lawson and Mr. Reaves played poker.

Petitioners point out that Lawson initially misled Bozeman about the 282 checks.  We believe Lawson adequately explained why

he did so; his prior statements were an ineffectual but unsurprising attempt to conceal petitioners' check cashing scheme from respondent.

Cummings testified that he stole livestock from Reaves Livestock with Lawson's help, sold the livestock, and split the proceeds with Lawson. Petitioners contend that Cummings' testimony shows that Lawson was likely to embezzle. We disagree. Cummings' testimony is questionable because in 1991 he said that Lawson was not involved in these thefts; he changed his story shortly before the trial in this case. Whether or not Lawson helped Cummings steal from petitioners, we are not convinced that he embezzled the cash from the 282 checks for reasons given above.

Petitioners contend that their conservative lifestyle and their ability to live on their income shows that they did not receive the proceeds from the 282 checks. Mr. Reaves testified that he used cash in his business, but he provided no records showing how much cash he used or how he used it. His vague explanations do not persuade us that he used the proceeds of the 282 checks for business expenses. Petitioners failed to keep records that were sufficient to enable respondent to determine their tax liabilities. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

We conclude that the proceeds of the 282 checks are constructive dividends to Mr. and Mrs. Reaves.[6]

### 2.   Two Circle S Livestock, Inc. Checks

Mr. Reaves endorsed and cashed two Circle S checks dated May 1, 1987, payable to Marlboro Farms for $3,164 and $2,554.  Mr. Reaves testified that he used the cash from these checks to buy livestock.  Respondent offered no contrary evidence.  We may not arbitrarily disregard testimony that is competent, relevant, and uncontradicted.  Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. 99 T.C. 370 (1992) and T.C. Memo. 1992-616; Demkowicz v. Commissioner, 551 F.2d 929, 931-932 (3d Cir. 1977), revg. T.C. Memo. 1975-278; Banks v. Commissioner, 322 F.2d 530, 537 (8th Cir. 1963), affg. in part and remanding in part T.C. Memo. 1961-237.  We conclude that the two Circle S checks are not constructive dividends to Mr. and Mrs. Reaves.

### 3.   The Lumberton Auction Co. Checks

Respondent contends that the 13 checks from Lumberton Auction, all of which were cashed, were constructive dividends to Mr. and Mrs. Reaves.  We disagree, except for one check payable to Mr. Reaves.

---

[6] Because we conclude that Mr. Reaves' testimony is unreasonable, we reject petitioners' contention that they may meet a lesser burden of proof by reasonably denying receiving unreported income.

The $5,997 that Prevatte and Mike Reaves received from the Lumberton Auction checks written to them are not constructive dividends to Mr. and Mrs. Reaves. The other Lumberton Auction checks payable to Reaves Livestock and S&J are not constructive dividends to Mr. and Mrs. Reaves because there is uncontradicted evidence that the proceeds went to the payees and did not go to Mr. and Mrs. Reaves.

One Lumberton Auction check for $95 dated April 2, 1986, was payable to and endorsed by Mr. Reaves. We conclude that this check is income to Mr. Reaves.

Respondent contends that Mr. Reaves owned Lumberton Auction. We disagree. Mr. Reaves denied ownership, and respondent offered no evidence to the contrary.

Respondent contends that the First Citizens accounts are Mr. and Mrs. Reaves' personal accounts. Thus, respondent contends that the Lumberton Auction checks are constructive dividends because some of them were payable to S&J. We disagree. Mr. Reaves used these accounts in part as Reaves Livestock accounts. Reaves Livestock's bookkeepers wrote checks and kept the bank records for the First Citizens accounts. Most of the checks written on the S&J account and many written on the George K. Reaves account were for business purposes. The Lumberton Auction Co. checks payable to a First Citizens account are not

constructive dividends to Mr. and Mrs. Reaves unless they were used for their personal benefit. The Lumberton Auction Co. checks were not paid for Mr. and Mrs. Reaves' personal benefit except for the $95 check payable to Mr. Reaves.

4. Undecipherable Check Payable to Mike Reaves and Endorsed by Mike Reaves

Respondent contends that Mr. Reaves received the cash from an undecipherable check payable to Mike Reaves. We disagree. Mike Reaves endorsed the check and received the cash. We conclude that it is not a constructive dividend to Mr. and Mrs. Reaves.

5. Disputed Checks Written on the First Citizens Accounts

The parties dispute whether several checks (described next) written on the First Citizens accounts are constructive dividends to Mr. and Mrs. Reaves. Respondent contends that they are, because Mr. and Mrs. Reaves controlled the disposition of the funds in the First Citizens accounts and petitioners used the proceeds of these checks for personal purposes. Petitioners contend that they used the proceeds from these checks for business purposes and that they did not receive any personal benefit.

a.   $4,750 Check Drawn on The S&J Account

The $4,750 check written on the S&J account that Mrs. Reaves endorsed and cashed is not a constructive dividend because she used it to pay Lee for corn.

Respondent contends that, if $4,750 was the price after allowing a 10-percent discount, then the undiscounted selling price for the corn would have been $5,277.77. Respondent assumes that Mr. Reaves and Lee would have calculated a discount equal to exactly 10 percent and argues that the price of a load of corn would be more in round numbers. Respondent's point is purely speculative and is an insufficient basis for us to disregard the testimony on this point.

Respondent points out that petitioners did not call Lee to testify and contends that we should infer that his testimony would have been adverse to petitioners. Apparently either party could have called Lee to testify. We decline to apply an adverse inference against petitioners here. See Gaw v. Commissioner, T.C. Memo. 1995-531.

b.   Checks for $11,730 Drawn on the George K. Reaves Account and $23,800 Drawn on the S&J Account

Respondent contends that the proceeds of the $11,730 check drawn on the George K. Reaves account with the notation "1966 Rogers Trailer" and the $23,800 check drawn on the S&J account

payable to Crook Motor Co., Inc. are constructive dividends to petitioners because they controlled the George K. Reaves account. Mr. Reaves lent the funds to Lumberton Paving to buy the vehicles in his capacity as an officer of Reaves Livestock. Mr. Reaves did not need or personally benefit from the dump truck or the trailer. Respondent offered no evidence to the contrary.

We conclude that the $11,730 and $23,800 checks to buy the dump truck and trailer were loans from Reaves Livestock to Lumberton Paving, not constructive dividends to Mr. and Mrs. Reaves.

### c. George K. Reaves Account Check for the Dillon House

Respondent contends that the proceeds of the check drawn on the George K. Reaves account to buy the Dillon house were a constructive dividend to Mr. and Mrs. Reaves, primarily because Mrs. Reaves took title to the house. We disagree. Reaves Livestock used the proceeds from this check to buy a house for Grant. Reaves Livestock had a reasonable business interest in helping Grant live closer to work. Grant lived in the Dillon house, paid for repairs, taxes, and insurance, and later paid Reaves Livestock for and took title to the house. Neither Mr. and Mrs. Reaves nor Reaves Livestock made a profit from the Dillon house.

Respondent points out that title to the house was in Mrs. Reaves' name until Grant bought the house from Reaves Livestock. Respondent contends that this fact shows that Mr. and Mrs. Reaves and not Reaves Livestock bought the house and contends that there is no evidence that Reaves Livestock lent money to Grant. We disagree. Mr. and Mrs. Reaves testified that Reaves Livestock lent Grant the money to buy the house. Reaves Livestock bought the house. Grant repaid Reaves Livestock, not Mr. and Mrs. Reaves. Mrs. Reaves took title as a corporate agent. We conclude that Reaves Livestock bought the Dillon house for Grant, and that the purchase of the house was not a constructive dividend to Mr. and Mrs. Reaves.

### d. The $55,000 S&J Account Check To Repay Reaves Livestock for the Beach House Loan

Petitioners contend that the $55,000 Mr. and Mrs. Reaves obtained from Reaves Livestock for the beach house in 1986 was a loan, not a constructive dividend. We agree. However, Mr. and Mrs. Reaves received a constructive dividend when Mrs. Reaves used funds from the S&J account to repay $55,000 to Reaves Livestock because that was a personal use of S&J account funds.

### 6. The Seven Reaves Livestock Checks Payable to S&J

Respondent contends that the seven Reaves Livestock checks payable to S&J in 1986 are constructive dividends to Mr. and Mrs.

Reaves because Mr. Reaves endorsed three of them, and the other four are endorsed "S&J Farms" but no one signed them. We disagree. We have found that Mr. Reaves used the proceeds from these checks to buy the livestock as noted on each check.

7.  Conclusion

We conclude that Mr. and Mrs. Reaves received constructive dividends of $93,410 in 1984, $130,551 in 1985, $270,200[7] in 1986, and $222,982 in 1987.

C.  Mr. and Mrs. Reaves' Liability for Additions to Tax for Fraud

1.  Background

Respondent determined that Mr. and Mrs. Reaves are liable for the addition to tax for fraud under section 6653(b) for 1984, 1985, 1986, 1987, and 1988. For 1984 and 1985, if any part of a tax underpayment is due to fraud, the addition to tax for fraud under section 6653(b)(1) is 50 percent of the total underpayment of tax, and the addition to tax under section 6653(b)(2) is 50 percent of the interest payable under section 6601, but only with respect to that part of the underpayment that is due to fraud.

---

[7] We have found that Mr. and Mrs. Reaves received constructive dividends of $306,345 in 1986. Respondent determined that Mr. and Mrs. Reaves received constructive dividends of $270,200. We hold that Mr. and Mrs. Reaves received constructive dividends in the amount that respondent determined for 1986.

For 1986 and 1987, the addition to tax for fraud under section 6653(b)(1)(A) is 75 percent of the part of a tax underpayment that is due to fraud, and the addition to tax under section 6653(b)(1)(B) is 50 percent of the interest payable under section 6601 with respect to that part of the underpayment that is due to fraud.

Respondent has the burden of proving by clear and convincing evidence that Mr. and Mrs. Reaves fraudulently underpaid tax. Sec. 7454(a); Rule 142(b); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). Fraud cannot be imputed from one spouse to another. Secs. 6653(b)(4) (for 1984 and 1985) and 6653(b)(3) (for 1986 and 1987). Thus, respondent must prove that each spouse committed fraud. Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971).

2. Underpayment

Mr. and Mrs. Reaves concede that they underpaid tax in 1984, 1985, 1986, and 1987.

3. Fraudulent Intent

Respondent must prove by clear and convincing evidence that Mr. and Mrs. Reaves had fraudulent intent. Parks v. Commissioner, 94 T.C. 654, 664 (1990). For purposes of section 6653(b), fraud is actual, intentional wrongdoing, Mitchell v.

Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or intentionally committing an act for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

The Commissioner may prove fraud by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Several badges of fraud are present in this case: (a) Substantially understating income for several years, (b) having inadequate books and records, (c) dealing in cash to conceal income, (d) using fictitious names, (e) concealing income from their return preparer, (f) diverting corporate income for personal use, and (g) being convicted under section 7206(1). Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48; Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

a.    Substantially Understating Income

A pattern of consistently and substantially underreporting income over several years is evidence of fraud.  Holland v. United States, 348 U.S. 121, 137-139 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37.  Mr. and Mrs. Reaves did not report or account for nearly $500,000 over 4 years from the 282 checks.  Mr. and Mrs. Reaves received but did not report constructive dividends from the First Citizens accounts and the John Chavis checks totaling $13,814 in 1984, $19,551 in 1985, $89,150 in 1986, and $68,556 in 1987.  This badge of fraud applies to Mr. and Mrs. Reaves for 1984, 1985, 1986, and 1987, because they both knew of their personal expenses paid from the First Citizens accounts and the John Chavis checks in each of those years.  It also applies to Mr. Reaves because he knew of the 282 checks.

b.    Failing to Maintain Adequate Records

A taxpayer's failure to maintain accurate records is a badge of fraud.  Bradford v. Commissioner, supra at 307; Lollis v. Commissioner, 595 F.2d, 1189, 1192 (9th Cir. 1979), affg. T.C. Memo. 1976-15; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.  Mr. and Mrs. Reaves produced no records showing that they received or how they used the proceeds from the 282 checks, John Chavis checks, or the

First Citizens checks that were income to them. This badge of fraud applies to Mr. and Mrs. Reaves for 1984, 1985, 1986, and 1987, because they both did not maintain accurate records in each of those years.

### c. Dealing in Cash to Conceal Income

A taxpayer's use of cash to conceal income is evidence of fraud. Bradford v. Commissioner, supra. Mr. Reaves used the 282 checks to obtain cash which was concealed income. Mrs. Reaves used the John Chavis checks to obtain cash which was concealed income. This badge of fraud applies to Mr. and Mrs. Reaves for 1984, 1985, 1986, and 1987, because they used cash to conceal income in each of those years.

### d. Using a Fictitious Name

Using a fictitious name may be evidence of fraud. Lipsitz v. Commissioner, 21 T.C. 917, 937 (1954), affd. 220 F.2d 871 (4th Cir. 1955).

The 282 checks were written to fictitious payees. Mr. Reaves endorsed one of the checks in 1986. His endorsement of that check is a badge of fraud for him for 1986.

Mrs. Reaves signed some of the 282 checks for Reaves Livestock in 1984, 1985, 1986, and 1987, and endorsed some of them in 1985 and 1986. She also cashed checks written to

fictitious persons (Ray Hunt and John Chavis) in 1984, 1985, 1986, and 1987.

Mr. Reaves opened the S&J account with a Social Security number that was neither his nor Mrs. Reaves'. Mr. Reaves speculated that it might have been Prevatte's, but he also said that he did not know. This is a badge of fraud for Mr. Reaves.

This badge of fraud applies to Mr. and Mrs. Reaves for 1984, 1985, 1986, and 1987, because they both used fictitious names in each of those years.

e.   Concealing Income from Return Preparers

Concealing income from a taxpayer's return preparer can be evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Farber v. Commissioner, 43 T.C. 407, 420 (1965), modified 44 T.C. 408 (1965). Davis did not know about the First Citizens accounts or John Chavis checks or know that the 282 checks were written to fictitious payees when he filed Mr. and Mrs. Reaves' returns for the years in issue. Mr. Reaves did not tell Davis about any of these items. Mrs. Reaves gave Mr. and Mrs. Reaves' personal return information to Davis, but she did not tell Davis about the First Citizens accounts or the John Chavis checks.

Petitioners contend that Davis had access to all of their records and should have taken them into account. We disagree.

Mr. and Mrs. Reaves should have told Davis about the First Citizen accounts and the 282 checks, or instructed Lawson and Wright to do so. Instead, Mr. Reaves concealed these items from Davis. He left no record showing how the proceeds from the 282 checks were used. He opened the First Citizens accounts without including them as a part of Reaves Livestock's records.

Petitioners contend that Wright and Lawson should have told Davis about the John Chavis checks. We disagree. Wright and Lawson were not responsible for telling Davis how much income Mr. and Mrs. Reaves had.

This badge of fraud applies to Mr. and Mrs. Reaves for 1984, 1985, 1986, and 1987, because they concealed income from Davis in each of those years.

### f. Diversion of Corporate Income for Personal Use

A taxpayer's diversion of corporate funds to his own use is evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; United States v. Brill, 270 F.2d 525, 527 (3d Cir. 1959). Mr. Reaves diverted Reaves Livestock income to himself and Mrs. Reaves through the First Citizens accounts and through the 282 checks. Mrs. Reaves knew that she was receiving corporate income through the John Chavis checks. Mr. and Mrs. Reaves did not report their diverted income. This badge of fraud applies to Mr. and Mrs. Reaves for

1984, 1985, 1986, and 1987, because they both knowingly received diverted income for their personal use in each of those years.

g.  Conviction Under Section 7206(1)

A conviction for willfully and knowingly subscribing to a false income tax return under section 7206(1) is evidence that the taxpayer fraudulently intended to evade taxes.  Wright v. Commissioner, 84 T.C. at 643-644.  Mrs. Reaves pleaded guilty to violating section 7206(1) for 1986.  Mr. Reaves pleaded guilty to violating section 7206(1) for 1987.  This badge of fraud applies to Mrs. Reaves for 1986 and Mr. Reaves for 1987.

4.  Reliance on Wright, Lawson, and Davis

Mr. and Mrs. Reaves contend that they are not liable for the addition to tax for fraud because they relied on Wright, Lawson, and Davis to correctly prepare their income tax returns.  We disagree.

A taxpayer is not liable for the addition to tax for fraud under section 6653(b) if the taxpayer relied in good faith on a qualified accountant and disclosed all material facts necessary to prepare a correct tax return.  Alexander Shokai, Inc. v. Commissioner, 34 F.3d 1480, 1486 (9th Cir. 1994), affg. T.C. Memo. 1992-41; United States v. Whyte, 699 F.2d 375, 379-380 (7th Cir. 1983); United States v. Garavaglia, 566 F.2d 1056, 1060 (6th Cir. 1977).  Wright and Lawson were not involved in preparing Mr.

and Mrs. Reaves' personal returns or in providing the Reaves' personal financial information to Davis. Mr. and Mrs. Reaves did not rely on them for their personal taxes. Neither Mr. nor Mrs. Reaves told Davis about the 282 checks, First Citizens accounts, or the John Chavis checks. Since they did not disclose all material facts to Davis, they may not now escape liability for fraud by claiming they relied on him.

5. Items Attributable to Fraud

Respondent has shown by clear and convincing evidence: (a) Mr. Reaves intended to evade tax with respect to the 282 checks (respondent concedes that Mrs. Reaves did not know about the 282 checks); (b) Mr. and Mrs. Reaves intended to evade tax with respect to the withdrawals from the First Citizens accounts that they used for personal purposes; and (c) Mrs. Reaves intended to evade tax with respect to the John Chavis checks for each year in issue. Thus, Mr. Reaves is liable for the additions to tax under section 6653(b)(1) with respect to the entire underpayment for 1984 and 1985. He is liable for the additions to tax under section 6653(b)(2) for 1984 and 1985 and under section 6653(b)(1)(A) and (B) for 1986 and 1987 with respect to the underpayments relating to the 282 checks and withdrawals from the First Citizens accounts that Mr. and Mrs. Reaves used for personal purposes.

Mrs. Reaves is liable for the additions to tax under section 6653(b)(1) with respect to the entire underpayment for 1984 and 1985, except for each underpayment for which she is an innocent spouse. She is liable for additions to tax under section 6653(b)(2) for 1984 and 1985 and under sections 6653(b)(1)(A) and (B) for 1986 and 1987 with respect to the underpayments relating to the withdrawals from the First Citizens accounts that Mr. and Mrs. Reaves used for personal purposes and the John Chavis checks.

Petitioners contend that neither Mr. nor Mrs. Reaves is liable for the additions to tax for fraud on the underpayment of tax related to the 282 checks, the withdrawals from the First Citizens accounts, and the John Chavis checks because the underpayments are the fault of Wright and Lawson. We disagree. Mr. Reaves controlled Reaves Livestock. His testimony that he did not know about the 282 checks is not credible. Mr. and Mrs. Reaves controlled the First Citizens accounts. Even if Wright or Lawson invented the John Chavis check scheme, Mrs. Reaves was a knowing participant. We conclude that Mr. and Mrs. Reaves are liable for the underpayments due to fraud as described above.

The time to assess tax owed by Mr. and Mrs. Reaves has not expired for 1984 because Mrs. Reaves is liable for the addition to tax for fraud for 1984. Sec. 6501(c)(1).

D.    Reaves Livestock Liability for Additions to Tax for Fraud

    1.    Underpayment of Corporate Income Tax

Petitioners concede that Reaves Livestock underpaid its income tax and that Mr. Reaves caused Reaves Livestock's receipts that were not reported as income on the original corporate returns to be diverted to the First Citizens accounts in 1984, 1985, 1986, and 1987.

    2.    Corporate Fraudulent Intent

We may impute the fraud of a shareholder or an officer of a corporation to the corporation if the shareholder or officer controls the corporation, the corporation was the agent's alter ego, or the corporate agent's fraudulent acts benefited the corporation.  Loftin & Woodward Inc. v. United States, 577 F.2d 1206, 1244 (5th Cir. 1978); Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973), affg. in part and remanding in part T.C. Memo. 1971-194.  These circumstances are present here.  Mr. Reaves was president and sole shareholder of Reaves Livestock.  He and Mrs. Reaves, vice president of Reaves Livestock, controlled Reaves Livestock.  Reaves Livestock underreported its income by deducting as an expense the 282 checks to fictitious payees.  Reaves Livestock also underreported its income by diverting income to the First Citizens accounts and by overstating deductions with payments to the First Citizens

accounts.  Mr. and Mrs. Reaves controlled the First Citizens accounts.  Reaves Livestock also underreported its income by deducting the John Chavis checks which petitioners concede are constructive dividends and not deductible expenses.  Reaves Livestock participated in the fraud involving the 282 checks, the First Citizens accounts, and the John Chavis checks.  Reaves Livestock fraudulently underpaid tax with respect to the 282 checks, the deposits to the First Citizens accounts, and the John Chavis checks for each year in issue.

We conclude that respondent has shown by clear and convincing evidence that Reaves Livestock fraudulently intended to underpay tax for 1984, 1985, 1986, and 1987.

3.   Items Attributable to Corporate Fraud

We must identify the items with respect to which Reaves Livestock fraudulently intended to underpay tax because the additions to tax under section 6653(b)(2) for 1984 and 1985, and under section 6653(b)(1)(A) and (B) for 1986 and 1987 apply to the portion of the underpayment attributable to fraud.  As discussed above in par. D-2, Reaves Livestock fraudulently intended to underpay tax with respect to deductions it overstated by deducting the 282 checks, checks for deposit to the First Citizens accounts, and the John Chavis checks, and with respect

to income it diverted from Reaves Livestock to the First Citizens accounts.

The time to assess tax owed by Reaves Livestock did not expire for any of the years in issue because Reaves Livestock is liable for fraud in 1984, 1985, 1986, and 1987. Sec. 6501(c)(1).

E.  Addition to Tax for Substantial Understatement

Respondent contends that Mr. and Mrs. Reaves and Reaves Livestock are liable for the addition to tax for substantial understatement of tax for 1984, 1985, 1986, and 1987.

Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is the amount by which the correct tax exceeds the tax reported on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $5,000 ($10,000 in the case of a corporation). Sec. 6661(b)(1). Petitioners bear the burden of proving that the addition to tax under section 6661 does not apply.[8] Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).

---

[8] Petitioners do not contend that they have substantial authority or that they adequately disclosed the understatement under sec. 6661(b)(2)(B)(i) and (ii).

Petitioners contend that respondent should waive this addition to tax because they relied on professional advice and acted in good faith. Sec. 6661(c); see <u>Mailman v. Commissioner</u>, 91 T.C. 1079, 1082-1084 (1988). We disagree for reasons stated at par. C-4, above. The mistakes on their return were not Davis' fault. Petitioners did not convince us that they acted in good faith in failing to report income from the 282 checks, withdrawals from the First Citizens accounts for personal purposes, and the John Chavis checks.

Reaves Livestock did not give Davis all of the information about the 282 checks, the First Citizens accounts, and the John Chavis checks. Thus, the mistakes on the Reaves Livestock returns were not his fault.

We conclude that Mr. and Mrs. Reaves and Reaves Livestock are liable for the addition to tax for substantial understatement of tax for 1984, 1985, 1986, and 1987, if calculations under Rule 155 show that the understatements are substantial for purposes of section 6661(a).

F.    Whether Mrs. Reaves Qualifies as an Innocent Spouse

1.    Background

Mrs. Reaves contends that she qualifies as an innocent spouse under section 6013(e) for the constructive dividends discussed above except for the John Chavis checks and the $10,197 of unreported income that she conceded that she had in 1986.  She contends that she qualifies as an innocent spouse as to all other amounts at issue, including income that Mr. and Mrs. Reaves conceded they received from the First Citizens accounts.

To qualify as an innocent spouse under section 6013(e), Mrs. Reaves must prove:  (a) She filed a joint return for the years in issue; (b) there is a substantial understatement of income tax attributable to grossly erroneous items of the other spouse on the return; (c) she did not know or have reason to know of the substantial understatement when she signed the return; and (d) it would be inequitable to hold her liable for the deficiency attributable to the substantial understatement.  Sec. 6013(e)(1).  Failure to meet any of these requirements precludes a taxpayer from qualifying as an innocent spouse.  Sec. 6013(e)(1); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310.

Respondent concedes that Mrs. Reaves filed a joint return with Mr. Reaves for each year in issue and that all items are grossly erroneous because they are omitted income, but disputes that they are attributable to Mr. Reaves.[9]

We conclude that Mrs. Reaves knew or had reason to know of the understatements (other than those relating to the 282 checks) when she signed the returns and that it is not inequitable to hold her liable for tax.

2. <u>Knowledge of the Understatements on the Returns</u>

To be entitled to relief as an innocent spouse, Mrs. Reaves must show that she did not know and had no reason to know that there were understatements on the returns for the years in issue. Sec. 6013(e)(1)(C).

Mrs. Reaves maintained her family's financial records. She gave Davis the items that he used to prepare their income tax returns. She was vice president of Reaves Livestock and was authorized to sign its checks. She knew that checks were written on the First Citizens accounts for items that petitioners conceded are personal. She also knew that checks were written for personal items, such as for her beach house furniture, on the Reaves Livestock account. She routinely signed and cashed checks

---

[9] Respondent concedes that Mrs. Reaves is an innocent spouse with respect to the 282 checks.

drawn on the Reaves Livestock account at Southern National and the First Citizens accounts. She should have known about the understatements resulting from the personal expenses paid from the First Citizens accounts that petitioners conceded.

   3.   Not Inequitable To Hold Mrs. Reaves Liable

To be entitled to relief as an innocent spouse, Mrs. Reaves must show that it would be inequitable to hold her liable for the deficiencies in tax for the years in issue. Sec. 6013(e)(1)(D).

In deciding whether it is inequitable to hold a spouse liable for a deficiency, we consider whether the purported innocent spouse significantly benefited beyond normal support, either directly or indirectly, from the unreported income. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. at 242; H. Rept. 98-432 (Part 2) 1501, 1502 (1984); sec. 1.6013-5(b), Income Tax Regs. Normal support is determined by the circumstances of the taxpayers. Sanders v. United States, 509 F.2d 162 (5th Cir. 1975); Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

Mrs. Reaves contends that she did not benefit from the substantial understatement of income by her husband or receive

substantial amounts from him in the years in issue.  Mrs. Reaves points out that they had a conservative lifestyle.

Mrs. Reaves benefited from the understatements on petitioners' 1984, 1985, 1986, 1987, and 1988 returns because the constructive dividends were payments of her family's personal expenses from the First Citizens accounts.

We conclude that Mrs. Reaves is not an innocent spouse under section 6013(e) except with respect to the tax on the income from the 282 checks.

To reflect concessions and the foregoing,

<u>Decisions will be entered under Rule 155</u>.